Partial Concurrence and Partial Dissent by Judge MORRIS
OPINION
WARDLAW, Circuit Judge:
This case presents two questions of constitutional standing to assert claims under Title III of the Americans with Disabilities Act (“ADA”), and the question of whether those claims are maintainable as a class action. We must decide (1) whether a plaintiff may rely on the “deterrent effect doctrine” to establish constitutional standing under the ADA where she lacks firsthand knowledge that an establishment is not in ADA compliance; and (2) whether a plaintiff has constitutional standing where her only motivation for visiting a facility is to test it for ADA compliance. We conclude that standing may be asserted in both circumstances. However, although plaintiffs have standing to maintain this ADA suit, the district court did not abuse its discretion in denying class certification. The court did not err in finding thát the plaintiffs failed to meet Rule 23’s commonality requirement, given the lack of consistent policies or practices across the hotels owned by defendant Hospitality Properties Trust (“HPT”), but operated by others.
I.
HPT is a real estate investment trust (“REIT”) that owns hotels across the United States, REITs are vehicles for investors to own a fraction of a group of real estate holdings. Under federal statute, REITs are exempt from taxation on corporate profits; shareholders are taxed only when *1097 they receive dividends.[1] 26 U.S.C. §§ 856-859. To avoid taxation at the corporate level, REITs must, among other things, remain passive investors and delegate the management of particular facilities. Id. § 856(d)(7).
' Named Plaintiffs Ann Cupolo-Freeman, Ruthee Goldkorn, and Julie Reiskin (“Named Plaintiffs”) are physically disabled and use wheelchairs for mobility. Cupolo-Freeman and Goldkorn reside in California, while Reiskin lives in Colorado. Each phoned an HPT-owned hotel located in her state of residence that provided free local shuttle services, and each was informed that the hotel at issue did not provide equivalent shuttle service for mobility-impaired people. Each alleges that she would have stayed at the hotel she called but for its failure to provide equivalent shuttle service. In addition, each alleges that she still intends to stay at the hotel, but that its failure to provide equivalent shuttle service deters her from doing so at present.
Cupolo-Freeman, Goldkorn, and Reiskin, along with the Civil Rights Education and Enforcement Center (collectively “CREEC”),[2] filed a putative class action against HPT in the U.S. District Court for the Northern District of California, alleging that HPT had failed to offer equivalent accessible transportation services at its hotels in violation of Title III of the Americans with Disabilities Act (“ADA”), 42 U.S.C. §§ 12182(a), 12182(b)(2)(B), 12182(b)(2)(C).
Section 12182(a) provides:
.No .individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases ,to), or operates a place of public accommodation.
42 U.S.C. § 12182(a). A.hotel is a public accommodation. Id. § 12181(7)(A). Section 12182(b)(2)(B) specifically requires private entities that “operate” “fixed route systems” to provide equivalent service to those with disabilities.. Id. § 12182(b)(2)(B). Section 12182(b)(2)(C) requires the same of entities that “operate” “demand responsive systems.” Id. § 12182(b)(2)(C). CREEC alleges that, while most HPT hotels provide some form of free local transportation service, very few provide equivalent service that is accessible to people who use wheelchairs or scooters for mobility.
Before the district court, CREEC moved to certify the class pursuant to Federal Rule of Civil Procedure 23. It defined the class as people with limited mobility who have been or will be denied equivalent transportation services at HPT hotels. CREEC alleges that the common questions of fact and law include “[whether Defendant HPT’s transportation vehicles are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs,” and “[wjhether Defendant HPT has ensured that the transportation system in place at each hotel, when viewed in its entirety, *1098 meets the equivalent service requirements of’ the ADA. Fed. R. Civ. P. 23(a)(2). They also assert that certification is proper under Rule 23(b)(2) because HPT “acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or declaratory relief with respect to the class as a whole.”
The district court denied the motion. It held that the proposed class did not meet the threshold Rule 23(a) requirement of commonality because HPT delegates the operation of its hotels to management companies. Deciding CREEC’s claims, the district court held, would necessitate 142 “mini-trials” to determine whether the particular practices at each of the 142 challenged hotels violate Title III. In the alternative, the district court held that CREEC failed to meet the Rule 23(a) requirement of typicality, and failed to establish that injunctive relief would be “appropriate respecting the class as a whole,” Fed. R. Civ. P. 23(b)(2). CREEC timely appealed.
II.
The district court had federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. Civ. P. 23(f), which allows for interlocutory appeals from denials of class-action certification.
III.
We first address whether CREEC has properly asserted Article III standing. The following three elements constitute the “irreducible constitutional minimum” of standing: (1) an “injury in fact” suffered by the plaintiff; (2) a causal connection between that injury and the defendant’s conduct; and (3) a likelihood that the injury will be “redressed by a favorable decision.” Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). HPT argues that the Named Plaintiffs have failed to satisfy both the injury-in-fact and redressability requirements. We address these contentions in turn.

A. The Named Plaintiffs have properly alleged injury in fact.

Article III “requires that the party seeking review be himself among the injured.” Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). A plaintiff has sustained an injury in fact only if she can establish “an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (citations and internal quotation marks omitted).
Where, as here, a party seeks injunctive relief, “past exposure to illegal conduct does not in itself show a present case or controversy.” City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (alteration omitted). Instead, the plaintiff must allege “continuing, present adverse effects” stemming from the defendant’s actions. Id.
A plaintiff experiences continuing adverse effects where a defendant’s failure to comply with the ADA deters her from making use of the defendant’s facility. Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939, 953 (9th Cir. 2011) (en banc). We have dubbed this the “deterrent effect doctrine.” Id. at 949-50. “[W]hen a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers at a public accommodation to which he or she desires access, that plaintiff need not engage in the ‘futile gesture’ of attempting to gain access in order to show actual injury. ...” Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1135 *1099 (9th Cir. 2002) (quoting 42 U.S.C. § 12188(a)(1)). “So long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues.” Id. at 1137.
The relevant question, therefore, is whether the Named Plaintiffs are presently deterred from visiting HPT-owned hotels. We limit our evaluation to the pleadings. See Cent. Delta Water Agency v. United States, 306 F.3d 938, 947 (9th Cir. 2002) (The elements of standing “must be supported at each stage of the litigation in the same manner as any other essential element of the case.”).
The Named Plaintiffs have alleged in the First Amended Complaint that they intend to visit the relevant hotels, but have been deterred from doing so by the hotels’ noncompliance with the ADA. They further allege that they will visit the hotels when the non-compliance is cured. Thus, the ADA violations have prevented them from staying at the hotels. Without such averments, they would lack standing. However, “construing the factual allegations in the complaint in favor of the plaintiffs,” as we must at this preliminary stage, Mont. Shooting Sports Ass’n v. Holder, 727 F.3d 975, 979 (9th Cir. 2013), we conclude that the Named Plaintiffs have sufficiently alleged injury in fact. Chapman, 631 F.3d at 953. Their harm is “concrete and particularized,” and their intent to visit the hotels once they provide equivalent shuttle service for the disabled renders their harm “actual or imminent, not conjectural or hypothetical.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130.
HPT contends that this is the wrong result. It offers several reasons why the named plaintiffs cannot meet Article Ill’s injury-in-fact requirement: (1) they did not actually visit the hotels; (2) they do not intend to do so unless and until the alleged ADA violations are remedied; (3) they are motivated to visit the hotels only by their desire to test them for ADA compliance; and (4) they failed to allege injury in the original complaint, instead doing so only in the First Amended Complaint. None of these facts defeats standing.
1. The Named Plaintiffs were not required to visit the hotels.
While HPT concedes that a plaintiff need not make repeated in-person visits to ADA non-compliant sites in order to demonstrate that the defendant’s noncompliance has deterred her access, see Pickern, 293 F.3d at 1135, it contends that a plaintiff cannot satisfy the injury-in-fact requirement unless she has had at least one “personal encounter” with the alleged barrier. HPT argues that the Named Plaintiffs fail to meet this threshold because they, merely telephoned the hotels to inquire about transportation services available to disabled guests.
However, the purported requirement urged by HPT of a “personal encounter” with an access barrier lacks foundation in Article III. Actually visiting a hotel, as opposed to phoning, does not make a plaintiffs injury any more concrete: she is deterred from using the accommodation in either event. See Lujan, 504 U.S. at 560, 112 S.Ct. 2130. It is the plaintiffs “actual knowledge” of a barrier, rather than the source of that knowledge, that is determinative. Pickern, 293 F.3d at 1135.
True, whether a plaintiff has visited a facility in the past may be indicative of whether she will do so in the future. Requiring a plaintiff to “personally encounter” a barrier in order to obtain an injunction under Title III might screen out plaintiffs who do not in fact intend to use the facility—that is, plaintiffs for whom an injury is not actually imminent. See Lujan, *1100 504 U.S. at 560, 112 S.Ct. 2130. However, while past actions may constitute “evidence. bearing on whether there is a real and immediate threat of repeated injury,” Lyons, 461 U.S. at 102, 103 S.Ct. 1660, they are not necessarily dispositive evidence. For example, evidence of concrete travel plans would be sufficient to show that a disabled plaintiff intends to visit a facility, even if she has not travelled there in the past. See Lujan, 504 U.S. at 564, 112 S.Ct. 2130. Contrariwise, in the absence of "travel plans, a past visit might not be sufficient evidence of imminent future harm. See id.
Requiring a plaintiff to “personally encounter” a barrier would also cause line-drawing problems. Would it be enough to travel to the hotel and ask the concierge whether the hotel’s shuttle service accommodates the disabled, or must a plaintiff actually attempt to use the purportedly deficient accommodation? If the concierge says there is no accommodation, must the plaintiff perform a visual inspection or review schedules to verify this? What if the plaintiff is blind?
Nevertheless, HPT insists its “personal encounter” requirement is dictated by precedent, citing a district court' case', Brooke v. Peterson, 185 F.Supp.3d 1203, 1207-11 (C.D. Cal. 2016), for this proposition. Surveying Ninth Circuit cases on the deterrent effect doctrine, the Brooke court concluded that our precedent requires a plaintiff' to allege “personal, percipient knowledge of [alleged] barriers [to access]” to sufficiently assert standing. Id. at 1207-10. According to Brooke, secondhand knowledge—obtained, for example, from a concierge or the plaintiffs agent—is insufficient. Id.
The Brooke court reads too much into our prior cases. While it places talismanic weight on our use of the term “return” in Chapman, 631 F.3d at 953, and D’Lil v. Best Western Encina Lodge & Suites, 538 F.3d 1031, 1037-38 (9th Cir. 2008), those cases used the term to distinguish planned .visits from past ones, not to differentiate “personal” and “percipient” knowledge from secondhand knowledge. The cases cited in Brooke all happened to involve plaintiffs who had observed the lack of accommodation firsthand, but none.of them held that, this was a constitutional requirement.
Accordingly, we reject HPT’s invitation to create a bright-line predicate of a “personal encounter” with a barrier to access as a requirement for standing under ADA Title III. Making case-by-case determinations about whether a particular plaintiffs injury is imminent is well within the competency of the district courts. See, e.g., Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1335-37 (11th Cir. 2013) (assessing various factors in determining whether plaintiff suing under ADA Title III was likely to actually visit the supermarket, including prior visits, proximity of residence to store, plans for future visits, and status as an “ADA tester who has filed many similar lawsuits”).
2. The Named Plaintiffs need not intend to visit the hotels until after remediation.
HPT next contends that the- Named Plaintiffs failed to establish “a sufficient likelihood that [they] . will. again be wronged in a similar way,” Chapman, 631 F.3d at 948, given their allegation that they do not plan to stay at the hotels unless and until HPT remedies the alleged violations. This argument has some superficial appeal, because courts have denied standing where a plaintiff was unlikely to actually experience a threatened harm. See, e.g., Morton, 405 U.S. at 734-35, 92 S.Ct. 1361; Lujan, 504 U.S. at 562-64, 112 S.Ct. 2130.
*1101 However, this is really just a roundabout way of challenging the rule that a plaintiff need not engage in a “futile gesture” to establish Title III standing if she is on notice that the establishment “does not intend to comply” with the ADA. 42 U.S.C. § 12188(a)(1). As we held in Pickem, “under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered , an injury.” 293 F.3d at 1136-37. The injury continues so long as equivalent access is denied. Thus, HPT’s contention fails.
3. Motivation for visiting the hotels is irrelevant.
Our court has yet to decide whether plaintiffs suing under Title III of the ADA can claim “tester standing.” We begin our analysis of this question with Havens Realty Corp. v. Coleman, 455 U.S. 363, 372-74, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), in which the Supreme Court held that testers have standing to sue under Sections 804(d) and 812(a) of the Fair Housing Act (“FHA”), 42 U.S.C. §§ 3604(d), 3612(a). The Court first noted that Section 804(d) prohibits representations “to any person because of-race” that a dwelling is unavailable, when in fact it is available. Id. at 373, 102 S.Ct. 1114. The Court reasoned that Section 804(d) “establishes an enforceable right to truthful information concerning the availability of housing,” and that an invasion of this right causes harm that is potentially cognizable under Article III, Id. at 373-74, 102 S.Ct. 1114. Whereas Congress in Section 804(a) required a “bona fide offer” to rent or purchase before a plaintiff could sue for discriminatory refusal to sell or. rent, it included no such limitation in Section 804(d). Id. at 374, 102 S.Ct. 1114. The Court relied on this absence of limiting language to hold that, plaintiffs who “pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices” have, standing to sue for violations of Section 804(d). Id. at 373-75, 102 S.Ct. 1114.
We have held that the disabled may assert tester standing under the FHA. After Havens Realty was decided, Congress amended the FHA to specifically prohibit discrimination on thé basis of “handicap” in the “terms, conditions, or privileges of sale or rental of a dwelling.” 42 U.S.C. § 3604(f)(2). Following the reasoning of Havens Realty, we held that tester standing was available under this provision. Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1102-04 (9th Cir. 2004). We reasoned that, as with the provision at issue in Havens Realty, § 3604(f)(2) was by its terms not limited to bona fide purchasers. Id. at 1104. We held that “[i]nterpreting § 3604(f)(2) to exclude [testers] from enforcing their right to be free from discrimination undermines the specific intent of the [Fair Housing Act Amendments], which is to prevent disabled individuals from feeling as if they are second-class citizens.” Id.
Only the Tenth and Eleventh Circuits have considered in published opinions whether “tester standing” is viable under Title III of the ADA. The Eleventh Circuit reasoned in Houston that nothing in the text of 42 U.S.C. § 12182 constrains the statutorily created right “to be free from disability discrimination in the enjoyment of [a] facility” based on a plaintiffs motive for accessing the facility. 733 F.3d at 1332. Indeed, the court observed, § 12182(a) states that “[n]o individual shall be discriminated against on the basis of disability,” much like the prohibition against misrepresenting the availability of housing to “any person” in Havens Realty. Houston, 733 F.3d at 1332 (alteration in original). The court also noted that the ADA’s en *1102 forcement provision, § 12188, provides that “ ‘any person who is being subjected to discrimination on the basis of disability’ may bring suit,” exactly tracking the “any person” language of Havens Realty. Id. at 1332-33 (quoting 42 U.S.C. § 12188(a)(1)) (alteration in original). Finally, the Houston court pointed out that Congress knows how to limit standing to sue under discrimination statutes to certain groups of people, having done so both in the FHA, see 42 U.S.C. § 3604(a) (requiring “bona fide offer” to rent or purchase in order to bring suit), and Title III of the ADA, see 42 U.S.C. § 12182(b)(l)(A)(iv) (limiting suits for some actions to “clients or customers of the covered public accommodation”), but that it chose not to do so in § 12182(a). Houston, 733 F.3d at 1333. Accordingly, the court reasoned, a plaintiffs status as a tester does not deprive her of the right to sue for injunctive relief under § 12182(a). Id. at 1332-34.
The Tenth Circuit has also held that tester standing is viable under Title III of the ADA. Colo. Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1210-11 (10th Cir. 2014). The Colorado Cross court noted that “Title III provides remedies for ‘any person’ subjected to illegal disability discrimination.” Id. at 1211 (quoting 42 U.S.C. § 12188(a)). Thus, it concluded that “anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion.” Id.
We also conclude that motivation is irrelevant to the question of standing under Title III of the ADA. The Named Plaintiffs’ status as ADA testers thus does not deprive them of standing.
4. Injury is alleged in the operative complaint.
Citing the general rule that standing is determined “at the time the action commences,” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 191, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), HPT argues that two of the three Named Plaintiffs, Goldkorn and Reiskin, lack standing because they failed to include the factual bases for their allegations in the original complaint. However, “the proper focus in determining jurisdiction are the facts existing at the time the complaint under consideration was filed.” Northstar Fin. Advisors Inc. v. Schwab Invs., 779 F.3d 1036, 1044 (9th Cir. 2015) (internal quotation marks omitted). The First Amended Complaint was the complaint under consideration when the district court assessed standing, and it remains operative. Goldkorn and Reiskin adequately allege in that complaint that they were injured by HPT hotels’ failure to accommodate their disabilities. Accordingly, HPT’s argument fails.

B. The harm suffered by the Named Plaintiffs is redressable.

HPT also contends that the district court erred in finding that CREEC has standing because the Named Plaintiffs’ injuries are not redressable, given that it would be impossible for a court to fashion a class-wide injunction. However, this is just a reiteration of HPT’s view of the merits of CREEC’s claims. A plaintiff need only show that “a favorable decision will relieve” her injuries. Larson v. Valente, 456 U.S. 228, 243 n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). The Named Plaintiffs have requested that the court fashion an injunction mandating that the HPT hotels comply with the ADA. If the Named Plaintiffs were to prevail and receive their requested relief, then their injuries would be redressed. They have therefore satisfied the redressability requirement, whether or not they are correct on the merits.
*1103 IV.
A district court’s order denying class certification is reviewed for abuse of discretion. Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1164 (9th Cir. 2014). Assuming the district court has applied the correct legal standard, the reviewing court may set aside its decision only if the court’s reasoning was “illogical, implausible, or without support in inferences that may be drawn from the facts in the record.” Id.
A party seeking class certification must demonstrate that (1) “joinder of all members is impracticable,” (2) “there are questions of law or fact common to the class,” (3) the named plaintiffs’ claims or defenses are typical of those of the class, and (4) “the representative parties will fairly and adequately protect the interests of the class.” Fed. R. Civ. P. 23(a).
If a party succeeds in establishing all four of the 23(a) elements, it must then satisfy one of the three requirements of Rule 23(b). CREEC relies on Rule 23(b)(2), which requires a showing that “the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole.” CREEC contends that injunctive relief is appropriate because HPT has failed to ensure the provision of equivalent shuttle services at its hotels, and because the district court could conceivably instruct HPT to implement uniform policies or practices to comply with the ADA.
The district court denied CREEC’s class certification motion, concluding that CREEC failed to demonstrate either commonality or typicality. Fed. R. Civ. P. 23(a)(2)-(3). It also held that CREEC failed to satisfy the requirements of Rule 23(b) because the injunction it sought would have been impermissibly vague, nothing more than “a bare injunction to follow the law.” Parsons v. Ryan, 754 F.3d 657, 689 n.35 (9th Cir. 2014).
Rule 23(a)(2) requires “a common contention ... of such a nature that it is capable of classwide resolution.” Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). A contention is common to all members if “determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.” Id.
HPT—a REIT—owns some 302 hotels across the United States. CREEC has alleged that 142 of these hotels operate shuttle services in a manner that violates the ADA. However, HPT does not itself operate the hotels. To enjoy tax benefits under statute, REITs must, among other things, remain passive investors and delegate the management of particular facilities. 26 U.S.C. § 856(d)(7). Accordingly, HPT employs various professional management companies that are “eligible independent contractors” to operate the hotels it owns. An “eligible independent contractor” is a person or corporation that is “actively engaged in the trade or business of operating qualified lodging facilities,” and that does not control more than 35 percent of the REIT’s shares or voting power.[3] 26 U.S.C. *1104 §§ 856(d)(3), 856(d)(9). Although HPT’s agreements with the management companies require the latter to “comply with all laws in their fulfillment of their management agreement obligations,” those agreements also stipulate that the management companies “shall have sole, exclusive and uninterrupted control over the operation of the Hotels.” HPT “does not set or provide the Management Companies with any uniform policy or plan regarding the operation of shuttle or transportation services at its hotels.” Thus, it is the management companies, not HPT, that decide whether to offer local transportation services and that set the terms on which those services operate.
HPT argues that there can be no common question regarding the operation of its hotels as a matter of law, because federal law requires HPT to delegate operating authority to independent contractors if it wishes to maintain its REIT status and the tax benefits that flow therefrom. See 26 U.S.C. § 856(Z )(3)(A). However, the district court held that the fact that HPT lacks a specific and uniform policy to ensure ADA compliance at its hotels defeated commonality, regardless of HPT’s reasons for lacking such a policy. The court reasoned that, absent a legal duty to adopt specific policies to comply with the ADA, “it is unclear how HPT’s admitted lack of a policy regarding the operation of shuttle or transportation services could serve as the ‘glue’ holding together Plaintiffs claims.” Id. (citing Wal-Mart, 564 U.S. at 352, 131 S.Ct. 2541). Given that there was no “common offending policy,” the court, held, “proving that each of the 142 hotels violated the ADA would require 142 trials within a trial.” Id.
The district court did . not abuse its discretion in finding that the class lacked commonality. The court correctly found that HPT did not have a policy regarding how its eligible independent contractors had to comply with the ADA. CREEO insists that HPT maintained an unwritten, defacto policy of noncompliance that resulted in widespread ADA violations. See, e.g., Jimenez, 765 F.3d at 1165-66 (finding commonality based on alleged unofficial policy of discouraging employees from reporting overtime), However, CREEC has not alleged any facts that would support this theory. On the allegations in the amended complaint, HPT has done nothing to discourage its contractors from complying with the ADA. Indeed, HPT’s contracts require hotel operators to comply with applicable federal and state laws. This is a policy of delegation, not of non-compliance. While commonality may be established based on a “pattern of officially sanctioned .,. [illegal] behavior,” Nordstrom v. Ryan, 762 F.3d 903, 911 (9th Cir. 2014), merely pointing to a pattern of harm, untethered to the defendant’s conduct, is insufficient.
Nor did- the district court abuse its discretion in finding that the factual Issues regarding alleged ADA violations are significantly different at the various hotels.[4] There is no evidence of a single, “general policy of discrimination” that could serve as a common issue. Wal-Mart, 564 U.S. at *1105 352-53, 131 S.Ct. 2541. A practice may indeed be evidence of a systematic policy, see, e.g., Jimenez, 765 F.3d at 1165-66 & n,5, but it is undisputed that HPT, pursuant to its contracts, does not participate in the management and operation of the hotels. Absent any allegation that HPT somehow discourages its contractors from complying with the ADA, CREEC cannot establish a pattern of discrimination orchestrated by HPT, as it must in order to establish a question of fact common to its claims against HPT.
CREEC tried to avoid this conclusion at oral argument by insisting that HPT has a “nondelegable duty” to comply with the ADA specifically. Nondelegable duty is a tort concept associated with vicarious liability theories. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 57 cmt. b (Am. Law Inst. 2012). Contrary to CREEC’s contention, however, the concept “does not mean that an actor is not permitted to delegate [an] activity to an independent contractor.” Id. Rather, it means, that an actor “will be vicariously liable for the contractor’s tor-tious conduct in the course of carrying out the activity.” Id. Even if HPT would be vicariously liable for ADA violations by its hired contractors, we fail to see how this fact bears on commonality, It would only create a common issue as to where the financial burden of liability would fall, not one regarding the question of that liability. While the latter issue is “central to the validity” of CREEC’s claims, Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541, the former is not.
The cases the dissent cites for the .proposition that similarity of the harm to plaintiffs may constitute a common issue, with nothing more, are inapposite. Those cases all involved á common policy or practice. See Armstrong v. Davis, 275 F.3d 849, 863, 868 (9th Cir. 2001) (commonality satisfied where plaintiffs challenged written policy that failed to provide for adequate ADA requirements at parole hearings); Rodriguez v. Hayes, 591 F.3d 1105, 1122 (9th Cir. 2010) (commonality satisfied where plaintiffs challenged practice of holding detainees for longer than six months); Parsons v. Ryan, 754 F.3d 657, 664, 678 (9th Cir. 2014) (commonality satisfied where plaintiffs made “detailed factual allegations concerning the existence of uniform, statewide policies, and practices in all [Arizona Department of Corrections] facilities .,. [that] expose all .,. inmates to a substantial risk of harm"). To the extent the dissent suggests that HPT has intentionally failed to comply with the-ADA,--CREEC has not made such an allegation. Intentional noneompliance would amount to an unofficial policy of discrimination—a common issue weighing in favor of class certification. But a “policy against having uniform ... practices” is decidedly not a common issue. Wal-Mart, 564 U.S. at 355, 131 S.Ct. 2541.
CREEC contends that this result gives multiple-facility owners perverse incentives to vary their operating practices across - facilities or contract out operations to independent managers. However,, this argument rests on an important .unstated premise: that firms will violate the ADA rather than comply with it, so long as they can avoid class-action suits. Assessing whether:this premise is empirically true lies beyond judicial competence; altering incentives to comply with the ADA, beyond judicial authority.. We emphasize that our holding is limited to the issue of class certification under Rule 23. Whatever the incentives to sue under the ADA, Rule 23 does not require HPT to manage its properties in a manner that would facilitate class actions if and when ADA violations *1106 do occur.[5]
Because the district court did not abuse its discretion in concluding that CREEC failed to meet the commonality requirement, we need not reach CREEC’s arguments regarding typicality, remedy, or expert certification.
AFFIRMED.

. The Senate Finance Committee defines REITs as entities that “received most of [their] income from passive real-estate related investments,” S. Rep. No. 106-201, at 55 (1999). REITs receive conduit taxation treatment to “permit individual investors to get the benefit of centralized management and , diversification without being subjected to an extra layer of corporate taxes.” Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 99.5 (2017).

. After filing this appeal, CREEC voluntarily dismissed its claims before the district court. Nevertheless, for simplicity's sake, we follow the district court in referring to appellants as "CREEC.”

. HPT has contracted its hotel operations out to only a handful of independent operators. According to its website, its 500 hotels are operated by six eligible independent contracting firms, including such household names as Wyndham and Hyatt. Portfolio, HPT, http:// www.hptreit.com/portfolio/properties/default. aspx (last visited June 28, 2017). Presumably these managers maintain control over the properties they have contracted to manage, could themselves be named as defendants in separate class actions, and could ultimately be held responsible for any discriminatory practices.

. Specifically, the district court found that:
While some of the hotels contacted by the Named Plaintiffs are alleged to have not offered any wheelchair-accessible transportation at all, others are alleged to have offered wheelchair-accessible transportation, but required guests to cover the costs. Still other hotels are alleged to have required at least two days advance notice to arrange wheelchair-accessible transportation for a guest, whereas nondisabled guests were required to provide less notice.
Civ. Rights Educ. & Enforcement Ctr., 317 F.R.D. 91, 101 n.4 (N.D.Cal.2016) (citations omitted).

. We do not reach HPT's argument that the ADA does not apply to it because it is not an "operator” of transportation services at the hotels it owns. 42 U.S.C. § 12182(b). First, this issue is not before us, because it goes to the merits, not the issue of class certification. Second, even if this argument were to bear on class certification, we need not reach it because we affirm the district court on other grounds.